IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| JANET ROSA, § | |
|     PLAINTIFF, § | |
| § | |
| V. § | CIVIL ACTION NO. 4:08-CV-540-Y |
| § | |
| MICHAEL J. ASTRUE, § | |
| COMMISSIONER OF SOCIAL SECURITY § | |
|     DEFENDANT. § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.   STATEMENT OF THE CASE

Plaintiff Janet Rosa brings this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of the Social Security Administration denying her claim for supplemental security income (SSI) under Title XVI of the Social Security Act. Rosa applied for SSI benefits on August 8, 2005, alleging disability commencing January 1, 1990.[1]  (Tr. 121). After the Social Security Administration denied her

---

[1] The first month for which benefits can be paid is the month after the SSI application was filed regardless of how far back in time disability may extend. 20 C.F.R. § 416.335.

application for benefits both initially and on reconsideration, Rosa requested a hearing before an administrative law judge (ALJ), and ALJ Rita Carroll held a hearing on November 28, 2007. (Tr. 577). On February 8, 2008, the ALJ issued an unfavorable decision, finding Rosa was not disabled because she was capable of performing work that existed in significant numbers in the national economy. (Tr. 36). The Appeals Council denied Rosa's request for review, leaving the ALJ's decision to stand as the Commissioner's final decision. (Tr. 5).

B.   STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. § 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* § 416.920(d). Fourth, if disability cannot be found on the basis of medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 416.920(f). And fifth, the

impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 416.920(g); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198.

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* The court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C. ISSUES

    1. Whether the ALJ properly weighed the treating source opinions;

    2. Whether the ALJ needed to use a medical expert's services; and

    3. Whether the ALJ erred in assessing Rosa's residual functional capacity.

D. ADMINISTRATIVE RECORD

    1. Treatment Records

Rosa sought assistance from Tarrant County Mental Health and Mental Retardation Services (MHMR) in July 2005. (Tr. 214-16). She complained of mood swings, threatening and impulsive behavior, racing thoughts, and decreased sleep. Although she claimed that her symptoms began when she was fourteen, Rosa sought help only after threatening to physically harm her boyfriend. Rosa also complained of anxiety, an inability to keep a job, and difficulty concentrating. (Tr. 216). Treating psychiatrist Geetha Reddy, M.D., evaluated Rosa and diagnosed bipolar disorder, type I, mixed-moderate, with a current Global Assessment of Functioning (GAF) score of 50.[2] (Tr. 214).

Rosa was seen on August 8, 2005. She complained of erratic sleep and body aches with no apparent cause. The nurse instructed Rosa to gradually increase her medication and return to the clinic in two weeks. (Tr. 210). Two weeks later, Rosa reported that her mood was a little better and she was scheduled to begin counseling sessions. (Tr. 208). She was sleeping about sixteen hours a day, but also cleaned her house and spent time with her boyfriend. (Tr. 208).

Rosa saw Reddy on September 7, 2005, and reported a "360 turnaround" in her condition. (Tr. 206). Rosa still had some depression and low energy, but Reddy observed that Rosa was calmer and exhibited marked improvement. Reddy increased Rosa's medication to further stabilize her mood. (Tr. 206). In October 2005, Rosa described herself as "doing great," and had no mood swings, suicidal ideations, or paranoia. (Tr. 203).

In November, Rosa reported that she was not doing well since her sister died. She cried uncontrollably, spoke loudly to family members, and was having occasional visual hallucinations.

---

[2] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32  (4th ed. 1994)(DSM-IV). A GAF score of 41-50 reflects serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV at 34.

(Tr. 200). The importance of compliance with her medications was stressed during her appointment and she was referred to a grief support group. Her GAF score was lowered to 45. (Tr. 201).

Rosa saw Reddy again on December 6, 2005. (Tr. 198). Rosa had a recent argument with her boyfriend, but also reported a decrease in her depression and mood swings. She complained of feeling tired when she woke up even after sleeping eight hours, and she continued to be troubled by her sister's death. Rosa also reported occasional visual hallucinations. (Tr. 198). Her medication was increased in an effort to stabilize her mood. (Tr. 199).

In January 2006, Rosa reported a conflict with her niece during the holidays, but thought that medication was helping her mood swings, anger, and depression. (Tr. 196-97). When she saw Reddy in February 2006, Rosa complained of stomach cramps that might be a medication side-effect. (Tr. 194). She had occasional nightmares, but otherwise slept fine, and she reported no mood swings, racing thoughts, rages, or crying spells. She was groomed, cooperative, and calm, with normal mood and speech. (Tr. 194). Reddy decreased the dosage of Rosa's medication to address her stomach complaints. Rosa's diagnosis and GAF score remained unchanged. (Tr. 195).

Rosa moved out of her boyfriend's apartment in February 2006. (Tr. 243). In support of Rosa's application for government assistance, Reddy completed a physician's statement on February 20, 2006, in which Reddy opined that Rosa was permanently disabled as a result of bipolar disorder. (Tr. 248). Rosa's MHMR records also contain a second, undated statement from Reddy advising that Rosa was considered permanently disabled. (Tr. 192).

In April 2006, Rosa told Reddy that she had been arguing with a friend, but was not as angry or irritable. She reported feeling sad sometimes and worrying about her family. (Tr. 238). In May

2006, Rosa was exercising and had begun taking medication for early menopause. (Tr. 229). Her mood was stable, with no suicidal ideations or hallucinations. Her sleep varied, but she averaged eight hours a night. She lived with her mother and spent the day doing housework and listening to music. (Tr. 229). Her symptom severity was rated 3 on a scale of 10 (with 10 representing extreme symptoms), with moderate impairment in her functioning. (Tr. 229). She was counseled on anger management issues, (Tr. 231), and an undated statement from a counselor at MHMR also confirms Rosa's participation in an anger-management program. (Tr. 193).

On June 2, 2006, Rosa called MHMR because she had run out of medication and needed instructions on refilling her prescriptions. (Tr. 228). Rosa was hospitalized overnight at the end of June with a panic attack. (Tr. 224, 226). She had called the police and claimed that she was having a nervous breakdown, and the police took her to the county psychiatric hospital. (Tr .227). She told the hospital staff that she was much better and was only worried because her husband had not come home all night.[3] She admitted that she was having homicidal thoughts about harming her husband with a baseball bat. (Tr. 269-81). Her husband and mother were present and indicated that they believed Rosa would be safe if released to return home. (Tr. 269).

In July 2006, Rosa advised the MHMR staff that she was taking her medication regularly. (Tr. 222). Her symptom severity was rated a 2 on a scale of 10 (with 10 representing extreme symptoms), and her overall functioning was a 5 on a scale of 10. She was instructed to continue her medications as prescribed. (Tr. 223). In October 2006, the MHMR staff attempted to contact Rosa because she had not been to the clinic since July. Rosa was discharged from MHMR in December

---

[3] The administrative record indicates that Rosa occasionally referred to her boyfriend as her common-law husband.

after she failed to contact them. (Tr. 352-54).

Rosa reinitiated contact with MHMR in February 2007. She reported that she had been living in New York and had not taken her medications for two months. Although she described herself as doing okay, she was interested in restarting her medications. (Tr. 348).

MHMR staff psychiatrist Davinder Dhingra, M.D., began overseeing Rosa's treatment. At her initial visit in February 2007, Rosa explained that her eight-month absence was the result of family stressors. (Tr. 442). She was living with a friend, which she described as a chaotic arrangement. Rosa complained of mood swings and feeling depressed, helpless, and hopeless. (Tr. 442-43). In March, Rosa reported that she had moved into her own apartment. She complained of periods of anxiety and forgetfulness, but was coping better since her move. She was taking her medication and tolerating it well. (Tr. 439-40). Rosa was doing well at her MHMR appointment in April 2007. She was getting settled in her new home and had thought about going back to school. (Tr. 436). She was sleeping eight hours a night, and her energy level was good. Rosa's current medications were continued. (Tr. 437).

In May, Rosa reported that she was doing fine. She lived alone, but received financial assistance from her grandmother while she waited on a ruling on her application for disability benefits. (Tr. 433). Dhingra encouraged her to find a job. (Tr. 434). At her check-up on June 12, 2007, Rosa was doing well, but was sad because the anniversary of her sister's death was coming up. She was sleeping eight or nine hours at night, and her energy and appetite were good. (Tr. 430). In July, Rosa admitted that she was sleeping too much. She lived alone, but did spend time with a friend. Her symptoms were assessed as low to moderate in severity. (Tr. 427). During a follow-up visit on August 7, 2007, Rosa reported doing well on her current medication, but was worried about

getting her disability claim approved. She was sleeping eight hours at night and described her energy level as fair. (Tr. 424). In September, Rosa reported that she was staying busy. She had been depressed at times, but socialized with friends. (Tr. 421). She was encouraged to find some volunteer work. (Tr. 422). A state agency psychiatrist reviewed Rosa's application in September 2005 and found that her bipolar disorder was not a severe mental impairment. (Tr. 177-89).

At her MHMR visit in October 2007, Rosa reported that she was sleeping well and had good energy and a good appetite. She was frustrated because she was still waiting on approval of her disability claim and could not go out of town with her friends. (Tr. 561). Rosa was seen at MHMR on November 12, 2007. She was depressed because she had a friend who was ill. Rosa also recounted problems she had in high school that required her to take special education classes to earn her diploma.[4] Rosa had tried to work as a cashier, but found it too much of a strain. (Tr. 555).

Rosa also met with a counselor on a regular basis throughout 2007. The counselor indicated that Rosa demonstrated continued progress in her response to their counseling sessions. (Tr. 283-304, 340-44). When she met with her counselor in September, Rosa was doing well and had made new friends at her housing complex. She reported being motivated to get up, shower, and clean her apartment because of the possibility that someone might stop by to visit. Her counselor found that Rosa was showing some progress in gaining insight into her condition. (Tr. 283). In October and November, Rosa was working on adopting or becoming a foster-parent to a teenager. Rosa's counselor doubted this arrangement would be approved and opined that Rosa had little insight into how ill-equipped she was and her own need for support. (Tr. 539, 552).

---

[4] In her disability paperwork, Rosa indicated that she was not in special education classes. (Tr. 142). She testified at the hearing that she was in an English-as-a-second-language class in school. (Tr. 596).

FINDINGS, CONCLUSIONS AND RECOMMENDATION OF
THE UNITED STATES MAGISTRATE JUDGE–PAGE 8

Dhingra completed a mental impairment questionnaire in November 2007. She indicated that Rosa had bipolar disorder and required medication for her symptoms. (Tr. 528). No side-effects were noted. Dhingra reported that Rosa was alert and oriented during her MHMR appointments, with goal-directed thinking and fair judgment, but she had a history of poor insight. Dhingra assigned a guarded prognosis. (Tr. 528). Dhingra opined that Rosa's disorder had resulted in moderate restriction in her activities of daily living and social functioning; marked impairment in her ability to maintain concentration, persistence or pace; and three episodes of decompensation within a twelve-month period, with each episode lasting at least two weeks. Dhingra also found that Rosa suffered from a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or changes in environment was predicted to cause her to decompensate. (Tr. 530).

Dhingra also assessed Rosa's ability to perform various work-related activities. Dhingra found that Rosa had a limited, but satisfactory ability to understand, remember and carry out very short and simple instructions; interact with the general public; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. Rosa was considered seriously limited, but not precluded from understanding, remembering and carrying out detailed instructions; setting realistic goals and making plans independently; remembering work-like procedures; maintaining attention in two-hour segments; maintaining regular attendance and punctuality within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination or proximity to others without being unduly distracted; making simple work-related decisions; asking simple questions or request assistance; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; being aware of normal hazards and

taking appropriate precautions; traveling in unfamiliar places; and using public transportation. Dhingra opined that Rosa was unable to meet competitive standards with respect to her ability to complete a normal workday and workweek without interruption from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in work setting; deal with normal work stresses; and deal with the stresses of semiskilled and skilled work. (Tr. 531-32). Dhingra also opined that Rosa would have difficulty working on a sustained basis because she was a slow learner and had required special education classes.

2.   Hearing

Rosa testified that she lived alone. (Tr. 582). She had not worked since 2005 and explained that her nerves and inability to perform under pressure prevented her from working. (Tr. 583). Rosa testified that she was able to take care of herself and her house, but it depended on the mood she was in. (Tr. 583). She was able to drive, but also had her friends take her places. She occasionally attended church, but had no hobbies. (Tr. 584).

Rosa testified that she was fired from her most recent job as a cashier because she was graded on how long her customers took to submit their payment, which caused her to fail her probationary period. (Tr. 591-92). She also worked for a home-improvement store, but quit because she felt that her employer put too much pressure on her. Rosa had worked for a telemarketing company, but was part of a group of employees who were laid off. She was fired from a second telemarketing company because of a change in management. Rosa also worked for a dollar store, a school district, and another telemarketer, but could not recall if she had quit or been fired from any of those jobs. (Tr. 594-95). She worked as grocery store cashier, but lost that job because the

company decided to close the store. (Tr. 595). She also worked for Wal-Mart, but was fired for being too slow. (Tr. 595-96).

Rosa testified that she had taken anger management classes, which were helpful. (Tr. 596-97). She continued to have crying spells on days that she felt depressed, which occurred about once a week. She testified that she was able to follow instructions, but could not tolerate the peer pressure and stress of working. She explained that she must work at her own pace. (Tr. 598). Rosa also testified that she has impaired concentration and loses track of what she is doing  (Tr. 600).

Vocational expert Jennifer Maginnis testified that Rosa had relevant work experience as a cashier and telemarketer. (Tr. 602). The ALJ then asked Maginnis to consider a worker of Rosa's age, education, and work experience who was limited to simple work with only incidental contact with the public and co-workers. Maginnis testified that none of Rosa's previous work would be suitable, but there were other jobs that could be performed. (Tr. 602). Examples included unskilled work as a cafeteria attendant, with 7,000 jobs in Texas and 97,000 jobs nationwide; cleaner, with 6,500 jobs in Texas and 96,700 jobs nationwide; and production worker or final assembler, with 8,000 jobs in Texas and 188,000 jobs nationwide. (Tr. 603). When presented with the opinions included in Dhingra's medical questionnaire, Maginnis testified that these limitations would make it difficult for a person to maintain competitive employment. (Tr. 604-05).

      3.      Administrative Decision

The ALJ found that Rosa had not engaged in substantial gainful activity since the date she applied for benefits. He further found that her affective disorder constituted a severe impairment, but she had no impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 31). Based on consideration of the entire record, the ALJ found that Rosa had the residual functional capacity for simple work that required only incidental interaction with the public and co-workers. (Tr. 32). Although Rosa would be unable to perform any of her past relevant work, the ALJ found other jobs existed in significant numbers in the national economy that she could perform. (Tr. 35-36). Accordingly, the ALJ found that Rosa was not under a disability for purposes of SSI payments at any time since August 8, 2005. (Tr. 36-37).

E.    DISCUSSION

Rosa complains that the ALJ failed to weigh her treating psychiatrist's opinions in accordance with the law and reached a decision that is not supported by any medical opinion in the record. Generally, opinions, diagnoses, and medical evidence from a treating physician who is familiar with a claimant's impairments, treatments, and responses should be given great weight in determining disability. *See Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). The ALJ assigns controlling weight to the opinions of a treating physician if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 416.927(d)(2); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995). The determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and

conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *Leggett*, 67 F.3d at 564; *Greenspan*, 38 F.3d at 237. *See also* 20 C.F.R. § 416.927(e).

The disability regulations also set forth factors to be considered in weighing medical opinions, which include the length of the treatment relationship, frequency of examination, nature and extent of the treating relationship, evidence supporting the opinions, the consistency of those opinions, and medical specialization. *See* 20 C.F.R. § 416.927(d);. *See also* SOCIAL SECURITY RULING 96-2p, 96-5p. Absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, the ALJ must consider each of these factors before declining to give any weight to the opinions of the claimant's treating specialist. *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). The ALJ affirmed that he had considered the opinion evidence in accordance with the requirements of the regulations and Social Security Rulings. (Tr. 32).

Dhingra completed a functional capacity questionnaire in November 2007 in which she opined that Rosa's mental impairment left her seriously limited in many areas of work-related mental functioning and unable to perform a number of functions that are necessary to maintain competitive employment. The ALJ explained that the degree of functional limitation proposed by Dhingra and the low GAF scores reported in the treatment records were inconsistent with Rosa's own report of her activities during the relevant period. (Tr. 35). The ALJ also considered Dhingra's opinion that Rosa could be expected to decompensate with even a minimal increase in mental demands, but found this opinion was inconsistent with Rosa's medical history, including her success in living on her own after she returned from New York. (Tr. 35).

Rosa asserts that Dhingra's opinions were entitled to more weight because, among other factors, those opinions were consistent with Reddy's earlier assessment that bipolar disorder

rendered Rosa permanently disabled. Conclusory statements to the effect that Rosa is permanently disabled or unable to work are legal conclusions, not medical opinions, and are not entitled to any special significance. *See* 20 C.F.R. § 416.927(e)(1). *See also Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003). Moreover, the ALJ considered Reddy's February 2006 opinion of permanent disability, but found this opinion was unsupported by the facts, which showed significant improvement in Rosa's condition between July 2005 and July 2006. (Tr. 35). The ALJ recognized and complied with his duty to weigh the medical opinions of record, even if a more thorough discussion would have been preferable, and he articulated good cause for not assigning controlling weight to the treating source opinions to the extent they suggested that a finding of disability was appropriate.

Rosa contends that the ALJ was required to use the services of a medical expert because there was evidence that her bipolar disorder was of listing-level severity.[5] In particular, Rosa argues that a medical expert was needed to address Dhingra's November 2007 determination that Rosa's bipolar disorder met Listing 12.04.[6]

---

[5] A medical advisor is a neutral consultant who is designated by the Social Security Administration to review a claimant's medical records, explain or clarify information reflected therein, and express expert opinions regarding the nature and severity of impairments and whether such impairments equal the criteria of any impairment in the Listing of Impairments. 20 C.F.R. §§ 416.912(b)(6), and 416.927(f)(2)(iii). When a medical source functions as an expert witness in the course of an evidentiary hearing before an ALJ, he is referred to as a medical expert rather than an advisor. SOCIAL SECURITY RULING 96-6p.

[6] Listing 12.04 addresses affective or mood disorders:

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.
. . . .
  A. Medically documented persistence, either continuous or intermittent, of one of the following:
. . . .
  3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

The burden of establishing an impairment of listing-level severity is on the claimant. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). And generally, the decision to consult a medical expert or advisor is a discretionary one. *See Haywood v. Sullivan*, 888 F.2d 1463, 1467-68 (5th Cir.1989). The ALJ may ask for and consider opinions from medical experts on the nature and severity of an impairment or its equivalence to any listed impairment if the ALJ feels it is necessary, but the final responsibility for deciding whether an impairment meets or equals a listed impairment is reserved to the Commissioner. *Id.* at 1467. *See generally* 20 C.F.R. §§ 416.926(e), 416.927(e), (f)(2)(iii). Social Security Ruling 96-6p also requires that the ALJ obtain an updated medical opinion from a medical expert when additional medical evidence is received that, in the opinion of the ALJ, may change a previous medical opinion that an impairment does not equal the severity of any listed impairment. SOCIAL SECURITY RULING 96-6p. *See generally* 20 C.F.R. § 416.926 (addressing determination of medical equivalence).

Based on after-acquired evidence, the ALJ rejected the state agency medical consultant's

---

AND
B. Resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration;
OR
C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
    1. Repeated episodes of decompensation, each of extended duration; or
    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement.

20 C.F.R. Part 404, Subpart P, app. 1, § 12.04. Dhingra's assessment reflects findings that meet the criteria of paragraphs A and C, but not B. (Tr. 529-30).

opinion that Rosa had no severe mental impairment,[7] but apparently the ALJ did not believe that this evidence might result in an affirmative finding of equivalency at Step Three so that the services of a medical expert were required. (Tr. 35). Rosa relies on a treating source opinion that indicates that her impairment meets the criteria of Listing 12.04, but Ruling 96-6p's directive only applies when the issue is one of medical equivalence.[8] Rosa has presented no specific evidence or arguments that create a reasonable possibility that a medical expert would have found medical equivalence in her case. *See* 20 C.F.R. § 416.926(c) (addressing what evidence will be considered in deciding whether an impairment equals a listing). The ALJ did not err in failing to use the services of a medical expert, and the ALJ's determination that Rosa had no impairment meeting or medically equaling any listed impairment is supported by substantial evidence.

Rosa further complains that the administrative decision is unsupported because the ALJ, after declining to adopt the opinions of her treating psychiatrists, did not purport to rely on any medical source in assessing her residual functional capacity. Although an ALJ usually should request a medical source statement that describes the types of work-related activities that a claimant remains capable of performing, the absence of such a statement does not render the administrative record incomplete. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). Instead, the inquiry focuses on whether substantial evidence nonetheless is present in the existing record. *Id.*

---

[7] The ALJ stated that his decision was based on updated evidence and an interpretation of the record that differed from that of the state agency medical consultant. (Tr. 177-91).

[8] An impairment that either meets or medically equals a listed impairment and satisfies the twelve-month duration requirement results in a finding of disability at Step Three of the sequential evaluation process. 20 C.F.R. § 416.920(a)(4)(iii). To meet a listing, the impairment must satisfy all of the criteria outlined in the relevant listed impairment. 20 C.F.R. § 416.925(c)(3). An impairment that does not meet a listing may still be the medical equivalent of a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 416.926(a).

FINDINGS, CONCLUSIONS AND RECOMMENDATION OF
THE UNITED STATES MAGISTRATE JUDGE–PAGE 16

In assessing Rosa's RFC, the ALJ observed that Rosa's condition had stabilized with treatment, and he found the relatively low GAF scores assigned to her by staff at MHMR were not an accurate reflection of her functional capacity. (Tr. 34). The ALJ explained that Rosa's progress notes at MHMR generally reflected no more than mild symptoms, and the ALJ was convinced that Rosa's overall mental health improved significantly during the relevant time period. (Tr. 34-35). Overall, the ALJ found no reason that Rosa could not perform simple tasks that involved no more than incidental interaction with the public and coworkers. (Tr. 35). The ALJ sufficiently explained the basis for her assessment of Rosa's RFC, and substantial evidence supports that assessment even without a corroborating medical opinion.

Rosa asserts that the ALJ committed legal error because he failed to make a specific finding regarding her ability to maintain employment. Social Security Ruling 96-8p defines residual functional capacity (RFC) as an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. SOCIAL SECURITY RULING 96-8p. *See also* 20 C.F.R. § 416.945(b). A regular and continuing basis is considered eight hours a day, five days a week, or an equivalent work schedule. SOCIAL SECURITY RULING 96-8p.

The Fifth Circuit has adopted the principles underlying Ruling 96-8p and decided that, in assessing RFC, the adjudicator must discuss the claimant's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A finding that a claimant can perform substantial gainful activity requires more than a determination that the claimant can find work and physically perform the job: There must be a determination that the claimant could hold whatever job he obtains for a significant period of time. *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002). *See also Singletary v. Bowen*, 798

F.2d 818 (5th Cir. 1986).

Rosa asserts that the waxing and waning nature of her bipolar disorder presented the ALJ with precisely the situation that requires an express determination of her ability to hold whatever job she finds for a significant period of time, yet the ALJ made no separate finding on the issue. The ALJ's numbered findings of fact do not include a specific finding that Rosa could perform work on a sustained basis. Nonetheless, the decision reflects that the ALJ considered the issue of Rosa's ability to maintain employment as the ALJ correctly noted in her decision that the RFC assessment must reflect a claimant's ability to perform physical and mental work activities on a sustained basis despite the limitations imposed by the claimant's impairments. (Tr. 30). The ALJ then found that Rosa had the RFC to perform simple work with only incidental interaction with the public and coworkers, (Tr. 32), and after considering the testimony of a vocational expert, the ALJ found that Rosa was capable of making a successful adjustment to other work existing in significant numbers in the national economy. (Tr. 36). *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003). Although Rosa asserts that her sporadic employment history demonstrates that she cannot maintain employment, the ALJ agreed with the vocational expert's testimony that Rosa could perform none of her past relevant work given her RFC. It is unnecessary for the court to reverse and remand the Commissioner's decision for an express finding on an issue that was already addressed and decided by the ALJ. *See Bean v. Barnhart*, 454 F. Supp. 2d 616, 621 (E.D. Tex. 2006)(noting that court is not looking for perfect administrative opinion, but will reverse and remand the case only if there is reason to believe that remand might lead to different result).

The Commissioner's decision is supported by substantial evidence and has not been shown to be the result of legal error.

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED
### FINDINGS, CONCLUSIONS AND RECOMMENDATION
### AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document.  The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until July 16, 2009.  The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made.  *See* 28 U.S.C. § 636(b)(1).  Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until July 16, 2009, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the

filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED JUNE 25, 2009.


    /s/   Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE